**Rigano LLC**
538 Broad Hollow Road, Suite 217
Melville, New York 11747
(631) 756-5900
James P. Rigano, Esq.
Nicholas C. Rigano, Esq.
Leslie R. Bennett, Esq.
Alyse M. Delle Fave, Esq.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
CHRISTOPHER J. CORNETT,
BRUCE CORNETT and
CATHY CORNETT,

                         Plaintiffs,

          -against-

NORTHROP GRUMMAN CORPORATION,

                        Defendant.
------------------------------------------------------------------x

Case No. 18-6453

**COMPLAINT**

**_Jury Trial Demanded_**

     Plaintiffs Christopher J. Cornett ("Chris Cornett"), Bruce Cornett, and Cathy Cornett (collectively, "Plaintiffs" or "Cornetts"), by and through their attorneys, Rigano LLC, as and for their complaint against Defendant Northrop Grumman Corporation ("Defendant"), allege as follows:

**Preliminary Statement**

     Commencing in the 1930s, Defendant manufactured and designed military and aerospace aircraft in Bethpage. Defendant's operations in Bethpage resulted in millions, if not billions, of dollars in profit. Defendant's operations also resulted in the generation of extraordinary quantities of hazardous waste causing massive subsurface contamination throughout Bethpage.

     In the 1980s, Defendant's site was listed as a Class 2 Superfund site meaning that the site presents a significant threat to public health or the environment. A catastrophic plume of

1

groundwater contamination of approximately six (6) square miles, one of the largest in the country, emanates from the site. The plume underlies and has devastated the densely populated residential and commercial Bethpage community. The plume continues to migrate and, absent intervention, will impact neighboring communities downstream from Bethpage. Countless contaminants are contained in the plume and new contaminants continue to be discovered. Many of the contaminants contained in the plume are known or probable human carcinogens. These carcinogens have impacted several public drinking water supply wells that serve the Bethpage community.

The Cornetts have called Bethpage their home since 1984. Bruce and Cathy moved to Bethpage while Cathy was pregnant with Chris. They always lived within one-half (1/2) mile of the Defendant's site. During all times relevant, the Cornetts drank, cooked, bathed and showered with water directly from their kitchen and bathroom faucets. For a decade, Chris played little league baseball at Bethpage Community Park, the location of Defendant's former dumping ground. Unbeknownst to the Cornetts, their tap water was laced with carcinogens emanating from Defendant's site and the baseball field contained carcinogens in the soil at 3,400 times acceptable levels.

Commencing in 2015, the Cornetts went through hell. In December 2015, Cathy was diagnosed with kidney cancer. In June 2016, Chris was diagnosed with testicular cancer. In August 2017, Bruce was diagnosed with prostate cancer. Within twenty (20) months, a mother, father and son, each of whom were active healthy adults, were all diagnosed with cancer. None of Bruce's or Cathy's siblings or parents were ever diagnosed with any of these types of cancers.

After countless surgeries, procedures, and treatment, the Cornetts have been irreparably harmed and they live in a constant state of fear of illness returning. The Cornetts' cancers were

caused by Defendant's contamination. This action is brought to recover damages for the Cornetts' injuries and the pain and suffering caused by Defendant.

## Nature of the Action

1.      Plaintiffs bring this diversity action for personal injuries sustained due to the acts, omissions and conduct of Defendant.

## Jurisdiction and Venue

2.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332 as the parties are diverse and the matter in controversy exceeds $75,000.00, exclusive of interest and costs.

3.      Venue is proper in this district because a substantial part of the events or the acts or omissions giving rise to the claims occurred in this district.

## Parties

4.      Chris Cornett, the son of Bruce Cornett and Cathy Cornett, resides and is domiciled at 306 Van Wyck Road, Blauvelt, New York.

5.      Prior to April 2018, Chris Cornett lived his entire life from his birth in 1984 in Bethpage, New York, initially at 130 South 2nd Street until August 17, 1994, and subsequently at 19 Caroline Street.

6.      Bruce Cornett, the father of Chris Cornett and husband of Cathy Cornett, resides and is domiciled at 19 Caroline Street, Bethpage, New York.

7.      Bruce Cornett has lived in Bethpage since February 10, 1984, initially at 130 South 2nd Street until August 17, 1994, and subsequently at 19 Caroline Street.

8.      Cathy Cornett, the mother of Chris Cornett and the wife of Bruce Cornett, resides and is domiciled at 19 Caroline Street, Bethpage, New York.

9.      Cathy Cornett has lived in Bethpage since February 10, 1984, initially at 130 South

2nd Street until August 17, 1994, and subsequently at 19 Caroline Street.

10.     Defendant Northrop Grumman Corporation is a corporation organized under the laws of the State of Delaware with a principal place of business and headquarters located at 2980 Fairview Park Drive, Falls Church, Virginia.

**Factual Background**

**I.      Defendant's Activities and Agency Findings of Contamination Emanating from Those Activities**

11.     Commencing in the early 1930s and for decades thereafter, Grumman Aerospace Corporation, a predecessor of Defendant, operated at a facility in Bethpage, New York, encompassing approximately 605 acres ("Grumman site").

12.     The facility located at the Grumman site was owned and operated by Defendant.

13.     The operations at the Grumman site comprised the engineering, manufacturing, primary assembly, and research/development testing of a variety of military and aerospace crafts.

14.     Commencing in the early 1940s, the United States Navy established a facility known as the Naval Weapons Industrial Reserve Plant ("NWIRP site") within approximately 108 acres of the larger 605-acre Grumman site parcel in Bethpage.

15.     The facility located at the NWIRP site was owned by the Navy but operated by Defendant and its predecessor corporation.

16.     The operations at the NWIRP site comprised the design engineering, research prototyping, testing, fabrication and primary and subassembly of various naval aircraft.

17.     Upon information and belief, since no later than 1947, Defendant was aware or should have been aware that its operations at the Grumman site and the NWIRP site were causing subsurface hazardous waste contamination in Bethpage.

18.     Upon information and belief, Defendant was aware that the hazardous waste

contamination emanating from its operations at the Grumman site and/or the NWIRP site continued after 1947.

19.     Approximately 16 acres of the Grumman site were owned by Grumman Aircraft Engineering Corporation, a predecessor entity that was merged into Defendant in 1994.

20.     From approximately 1949 to 1962, Defendant, through its predecessor, used a portion of this 16-acre property, known as the Former Grumman Settling Ponds area, as a dumping ground for hazardous waste, specifically for dewatering of sludge, including neutralized chromic acid waste from the wastewater treatment facility located at the Grumman site.

21.     Defendant's improper management, storage, transport, disposal and failure to remediate the hazardous substances and hazardous waste at and emanating from the Grumman site, the NWIRP site, and the Former Grumman Settling Ponds area have caused great harm to the Bethpage community and individually to Plaintiffs.

22.     Much if not all of the risk posed by the harm could not be eliminated on any reasonable basis; it was unreasonable for Grumman to perform its activities adjacent or contiguous to the densely populated Bethpage community and its public water supply, including Plaintiffs' public water sources, and the harm posed and caused by those activities far outweighed any potential value to Grumman's activities.

23.     In 1962, Grumman Aircraft Engineering Corporation donated the 16-acre Former Grumman Settling Ponds area to the Town of Oyster Bay.

24.     Prior to donating the Former Grumman Settling Ponds area to the Town of Oyster Bay, Defendant and its predecessors knew or should have known that it used that property for waste disposal.

25.     Prior to donating the Former Grumman Settling Ponds area to the Town of Oyster Bay, Defendant and its predecessors knew or should have known that the property was grossly

contaminated.

26. In advance of donating the Former Grumman Settling Ponds area to the Town of Oyster Bay, Defendant and its predecessors knew or should have known that the Town of Oyster Bay intended to use the property for a public park where children, among others, would play.

27. Upon information and belief, Defendant and its predecessors failed to inform the Town of Oyster Bay that it used the Former Grumman Settling Ponds area for waste disposal until decades after donating the property.

28. Upon information and belief, Defendant and its predecessors failed to inform the Town of Oyster Bay that the Former Grumman Settling Ponds area was grossly contaminated until decades after donating the property.

29. From approximately 1962 to date, the Town of Oyster Bay has used the Former Grumman Settling Ponds area as the Bethpage Community Park for public recreation purposes where children, among others, play.

30. In or shortly after 1962, the Town of Oyster Bay built a baseball field on the Former Grumman Settling Ponds area.

31. Children played little league baseball games on the baseball field located on Former Grumman Settling Ponds area for decades.

32. In 1983, the Grumman site (including the NWIRP but excluding the Former Grumman Settling Ponds area), was added to the New York State Registry of Inactive Hazardous Waste Sites ("Superfund sites") maintained by the New York State Department of Environmental Conservation ("DEC") and classified as a Class 2a site, which is a temporary classification assigned to a site that has inadequate and/or insufficient data for inclusion in any of the other classifications.

33. In 1987, the Grumman site was reclassified as a class 2 Superfund site, meaning

6

the Grumman site poses a significant threat to human health and/or the environment and for which action is required.

34.     In March 1993, the Grumman site and the NWIRP site were separated and listed as independent class 2 Superfund sites, designated as Site 130003-A and Site 130003-B, respectively.

35.     In or about 1994, Grumman Aerospace Corporation was purchased by Northrop Corporation and became known as Northrop Grumman Corporation, the defendant in this action.

36.     In March 1995, DEC issued a Record of Decision ("ROD") with respect to contamination of the soil and groundwater at the Grumman site (excluding the Former Grumman Settling Ponds area) by various hazardous wastes, including certain volatile organic compounds ("VOCs").

37.     In May 1995, the Navy issued a ROD with respect to contamination of the soil and groundwater at the NWIRP Site by various hazardous wastes, including VOCs.

38.     In March 2001, the DEC issued a ROD with respect to offsite groundwater contamination emanating from the Grumman site and the NWIRP site.

39.     At the time of the issuance of the March 2001 ROD, it was determined that the contaminated groundwater plume extended over an area of approximately 2,000 acres and to a depth of approximately 700 feet.

40.     DEC determined that various contaminants identified in the groundwater emanating from the Grumman site and the NWIRP site exceeded Standards, Criteria and Guidance values ("SCGs") for drinking water, including VOCs, semivolatile organic compounds ("SVOCs"), pesticides, and polychlorinated biphenyls ("PCBs").

41.     According to the DEC 2001 ROD, the primary VOC contaminants which were used or disposed of at the Grumman site and the NWIRP site were trichloroethylene ("TCE"),

perchloroethylene ("PCE", also known as "perc" or tetrachloroethylene), dichloroethenes ("DCEs"), vinyl chloride and 1,1,1 trichloroethane.

42.     Those contaminants are the primary contaminants of concern subject to remediation under the DEC's March 2001 ROD.

43.     DEC's 2001 ROD does not mention 1,4-dioxane, Radium (as defined below), PFAS (as defined below) or other unidentified contaminants and therefore, those contaminants are not contaminants of concern under the DEC 2001 ROD.

44.     DEC's remedial selection for offsite groundwater contamination set forth in the DEC 2001 ROD is, and continues to be: (i) "hot spot" treatment to remediate offsite VOC groundwater contamination in one specified area, designated GM-38, of the Plume (defined below), (ii) long term groundwater monitoring, and (iii) wellhead treatment for public drinking water supply wells impacted by the Plume.

45.     DEC's 2001 remedial decision for offsite contamination does not require all contaminants within the Plume to be remediated to levels deemed non-hazardous to human health or the environment by New York State law.

46.     The public drinking water wells within the Plume have supplied, and continue to supply, drinking water to 130 South 2nd Street and 19 Caroline Street Bethpage, New York.

47.     Wellhead treatment is ineffective for unidentified contaminants such as Radium, 1,4-dioxane, and PFAS (all discussed below), subjecting captive citizens, such as Plaintiffs, to be exposed to unidentified contaminants at potentially hazardous levels within their drinking water.

48.     In March 2013, DEC issued a ROD with respect to the Former Grumman Settling Ponds area.

49.     The DEC determined that various contaminants found in the Former Grumman Settling Ponds area significantly exceeded the soil cleanup objectives and SGCs for drinking

8

water, including VOCs, SVOCs, PCBs and metals.

50.     The DEC further determined that residential homes to the south of the Former Grumman Settling Ponds area were also impacted by PCBs and chromium.

51.     By the DEC 2013 ROD, the DEC made a remedial selection requiring the removal of the contamination by excavation and disposal of approximately 25,000 cubic yards of soil containing PCBs in excess of 50 parts per million ("ppm") from approximately 3-acres within the Former Grumman Settling Ponds area, including the area where the baseball field has been located.

52.     To date, a vast majority of the contaminated soil subject to the DEC 2013 ROD has not been excavated and remains at the Bethpage Community Park.

II.     **Numerous Carcinogenic Contaminants Were Discharged by Defendant**

53.     Multiple contaminants from the Grumman site, the NWIRP site, and the Former Grumman Settling Ponds area have entered the groundwater and migrated with the groundwater south and southeast within Bethpage, extending horizontally to form an approximate six (6) square mile area of contamination and to a depth of approximately 750 feet ("Plume").

54.     The Plume has impacted numerous public drinking water supply wells in Bethpage.

55.     The Plume continues to migrate and, absent intervention, will impact neighboring communities downstream from Bethpage.

56.     Defendant has failed to fully remediate the Plume.

57.     Defendant has no public plans to fully remediate the Plume.

     *a.  VOCs in Drinking Water*

58.     Numerous VOC contaminants have been found in the groundwater emanating from

the Grumman site, the NWIRP site and the Former Grumman Settling Ponds area at levels within the Plume up to 15,000 ppb, nearly 3,000 times acceptable groundwater levels.

59.     The VOCs of concern within the Plume have been identified to be carcinogenic to humans.

60.     Human exposure to the VOCs of concern that exist within the Plume has been found to cause kidney cancer, testicular cancer and prostate cancer among other types.

61.     The VOCs have impacted public drinking water supply wells located within the Plume from, upon information and belief, at least 1984 through the present.

62.     Upon information and belief, Bethpage public drinking water wells were not treated to reduce VOC contamination until 1988.

63.     Upon information and belief, before 1988, water contaminated with VOCs was supplied to Plaintiffs' kitchen and bathroom faucets at toxic levels from the public drinking water supply wells located within the Plume.

64.     In the 1980s and 1990s drinking water standards for the contaminants of concern mentioned herein were far less stringent than they are today as it has since been determined that those contaminants are toxic at lower levels than once thought.

65.     Upon information and belief, during the 1980s and 1990s water contaminated with VOCs was supplied to Plaintiffs' kitchen and bathroom faucets at toxic levels from the public drinking water supply wells located within the Plume.

   b.  *Carcinogens in the Soil at the Baseball Field*

66.     PCBs, VOCs, SVOCs and metals have been detected in the soil at the Former Grumman Settling Ponds area and where the baseball field has been at levels up to 3,400,000 ppb, or 3,400 times DEC soil cleanup objectives for recreational activity.

67.     The carcinogens have been present in the soil at the baseball field for decades.

10

68. Human exposure to the contaminants found in the soil at the Former Grumman Settling Ponds area has been linked to an increased risk of testicular cancer, kidney cancer, and prostate cancer, among other types.

### c. Radioactive Material in Drinking Water

69. In 2012, radium-226 and radium-228 (together, "Radium"), radioactive metals that are known human carcinogens, were both tested for the first time in public drinking water supply wells located within the Plume.

70. At that time, Radium was detected in at least one public water supply well located within the Plume at levels exceeding five (5) pCi/L, which is the maximum contaminant level ("MCL") established by the United States Environmental Protection Agency ("EPA") and DEC.

71. In 2013, the water district shut down a public drinking water supply well located within the Plume due to this elevated Radium detection.

72. In 2016, Defendant's consultant revealed that Defendant used many radioactive materials, including Radium, during its operations at the Grumman site and/or the NWIRP site.

73. Defendant failed to reveal the use of Radium at the Grumman Site to the applicable government agencies before 2016, so Radium was not suspected to be a contaminant emanating from the Grumman site until then.

74. Upon information and belief, Radium found within the public drinking water supply wells located within the Plume emanates from the Grumman site.

75. Upon information and belief, before 2013, water contaminated with Radium was supplied to Plaintiffs' kitchen and bathroom faucets at toxic levels from the public drinking water supply wells located within the Plume for years, if not decades.

### d. 1,4-dioxane in Drinking Water

76. 1,4-dioxane is a man-made chemical.

77.    1,4-dioxane is a probable human carcinogen by all routes of exposure.

78.    1,4-dioxane is an emerging contaminant with no legally binding standard to date.

79.    New York State is in the process of setting a legally binding drinking water standard for 1,4-dioxane.

80.    EPA has established a drinking water health advisory for 1,4-dioxane at 0.35 ppb.

81.    1,4-dioxane is a known stabilizer for VOCs, and particularly 1,1,1-trichloroethane.

82.    VOCs, including 1,1,1-trichloroethane are contaminants of concern within the Plume.

83.    Defendant used 1,4-dioxane at the Grumman site.

84.    1,4-dioxane has been detected throughout the Plume and in public water supply wells in Bethpage at levels significantly exceeding the 0.35 ppb EPA health advisory.

85.    The 1,4-dioxane contamination found within the Plume is likely emanating from the Grumman site as a result of Defendant's operations.

86.    In 2013, the local water district in Bethpage tested 1,4-dioxane in its public drinking water supply wells for the first time.

87.    In 2013, the local water district detected 1,4-dioxane levels in the effluent of its public drinking water supply wells up to 8.6 ppb, or more than twenty-four (24) times the 0.35 ppb EPA health advisory level.

88.    The 1,4-dioxane impacting public drinking water supply wells located within the Plume emanates from the Grumman site.

89.    As a result of Defendant's operations Plaintiffs have been supplied, were supplied, and continue to be supplied, with drinking water laced 1,4-dioxane at hazardous levels.

90.    Hazardous levels of 1,4-dioxane continue to be supplied to Plaintiffs from wells located within the Plume as technology has not advanced to the point where remediation is fully

12

feasible and reliable.

91.     Upon information and belief, 1,4-dioxane was supplied to Plaintiffs from the public drinking water supply wells located within the Plume for years, if not decades, before 2013.

    ***e.   Unidentified Contaminants in Drinking Water***

92.     Currently, the USEPA regulates only 94 contaminants under the Safe Drinking Water Act with the most recent regulation set in 2006, and before that in 2000.

93.     Meanwhile, there are more than 85,000 chemicals on the market today that are listed on the inventory of substances that fall under the Toxic Substances Control Act.

94.     Advances in technology and science have shown that many chemicals can spread, migrate and dissolve more quickly than previously thought and present dangerous toxicity at low levels.

95.     These concerns are amplified for drinking water supply wells in plumes, particularly the complex plume located in Bethpage.

96.     As evidenced by newly detected Radium and 1,4-dioxane in public drinking water supply wells emanating from the Grumman site, it is expected that additional unidentified contaminants emanating from the Grumman site were, have been, and/or continue to be, supplied to Plaintiffs from the public drinking water supply wells located within the Plume.

97.     Upon information and belief, as a result of Defendant's operations, other unidentified contaminants, including, but not limited to perfluoroalkyl and polyfluoroalkyl substances ("PFAS"), are, were, or have been contained in the Plume and the drinking water supplied to Plaintiffs at toxic levels.

98.     Upon information and belief, as a result of Defendant's operations Plaintiffs have been supplied, were supplied, or continue to be supplied, with drinking water laced with unidentified contaminants at hazardous levels.

99.     Upon information and belief, the unidentified contaminants, including, but not limited to PFAS, are likely human carcinogens that cause an increased risk of testicular cancer, kidney cancer and prostate cancer, among other forms of cancer.

### III.     Plaintiffs' Exposure to the Carcinogenic Contaminants

100.     Plaintiffs have been exposed to multiple toxic and/or carcinogenic contaminants emanating from the Grumman site, the NWIRP site and the Former Grumman Settling Ponds area since 1984 in a variety of ways.

101.     Plaintiffs' home residence from 1984 to 1994 at 130 South 2nd Street in Bethpage is located approximately one-third (1/3) of a mile southeast of the Grumman site and within the Plume where hazardous levels of VOCs, Radium, 1,4-dioxane, and other carcinogenic or otherwise toxic contaminants have been found in the subsurface and/or in the drinking water.

102.     Plaintiffs' home residence from 1994 at 19 Caroline Street in Bethpage is located approximately 0.4 miles southeast of the Grumman site and within the Plume where hazardous levels of VOCs, Radium, 1,4-dioxane, and other carcinogenic or otherwise toxic contaminants have been found in the subsurface and/or in the drinking water.

103.     The taps located in the kitchen and bathrooms at both the 130 South 2nd Street house and the 19 Caroline Street house are supplied water from public drinking water supply wells located within the Plume.

104.     During all relevant times, Plaintiffs, while at home, exclusively used the water supplied to their taps for drinking, cooking, bathing and showering.

105.     Cathy Cornett was pregnant with Chris Cornett when she moved to 130 South 2nd Street in Bethpage in 1984.

106.     Exposure of unborn children to the contaminants mentioned above may hinder

fetal development and cause increased risk of disease, particularly an increased risk of testicular cancer.

107.    Chris Cornett lived at either 130 South 2nd Street in Bethpage or 19 Caroline Street in Bethpage throughout his childhood and until earlier this year.

108.    Infants, toddlers and children are more susceptible to the carcinogenic effects of contaminants mentioned above than adults.

109.    Chris Cornett attended public schools in Bethpage, including Central Boulevard Elementary School, John F. Kennedy Middle School, and Bethpage High School, for grades Kindergarten through 12th grade.

110.    Each of those schools is located, and is supplied with drinking water from public water supply wells located, within the Plume.

111.    From 1988 through 1998, while he was in Kindergarten through 8th grade, Chris Cornett regularly played in Little League baseball games during both the fall and spring seasons at the baseball field located at Bethpage Community Park, which was the Former Grumman Settling Ponds area.

112.    When playing baseball, Chris Cornett was a second basemen and pitcher, meaning he spent a majority of his time on the dirt infield, which unbeknownst to him and his parents, was grossly contaminated.

113.    Cathy and Bruce Cornett would regularly watch Chris play baseball games at Bethpage Community Park.

114.    From 1991 through 1998, while he was in 2nd grade through 8th grade, Chris Cornett attended summer camp at Bethpage Community Park from the hours of 9:00 am to 5:00 pm three (3) days per week from June to August each year.

115.    Chris Cornett would spend at least one-third (1/3) of his time at the camp on the

baseball field.

116.   Water fountains and grass sprinkler systems in Bethpage Community Park were supplied with drinking water from public water supply wells located within the Plume.

117.   Plaintiffs were exposed to contaminants in the soil at the Bethpage Community Park, and in drinking water within the park, from at least 1988 through 1998.

118.   Plaintiffs were exposed to VOCs in the public water supply in connection with a variety of activities, including but not limited to, drinking water, cooking with water, bathing with water, and showering with water.

119.   Plaintiffs were exposed to Radium in the public water supply in connection with a variety of activities, including but not limited to, drinking water, cooking with water, bathing with water, and showering with water.

120.   Plaintiffs were exposed to 1,4-dioxane in the public water supply in connection with a variety of activities, including but not limited to, drinking water, cooking with water, bathing with water, and showering with water.

121.   Upon information and belief, Plaintiffs were exposed to unidentified contaminants, such as PFAS, in the public water supply in connection with a variety of activities, including but not limited to, drinking water, cooking with water, bathing with water, and showering with water.

122.   Chris Cornett was exposed to VOCs, Radium, 1.4-dioxane, and other carcinogenic and otherwise toxic contaminants while attending public school in Bethpage.

123.   Plaintiffs were exposed to PCBs and other carcinogenic and otherwise toxic contaminants at the Bethpage Community Park.

**IV.   Plaintiffs' Cancers**

124.   In or about December 2015, Cathy Cornett was diagnosed with cancer in her left kidney.

125. The kidney was removed by surgery in December 2015.

126. Permanent scars are visible on Cathy Cornett's body as a result of the surgery.

127. Cathy Cornett suffers from an immense fear of recurrence of her kidney cancer and the development of other illnesses as a result of her exposure to the contaminants discussed herein.

128. Chris Cornett was diagnosed with testicular cancer in or about June 2016.

129. The testicular cancer metastasized to other parts of his body, including Chris Cornett's retropineal, pelvic, and mediastinal lymph nodes; liver; lungs; and brain.

130. Upon diagnosis Chris Cornett's Beta HCG level, which is a tumor marker for testicular cancer, was 998,279.

131. By comparison, the Beta HCG level found in Lance Armstrong, the former Tour de France and Olympic cyclist who developed testicular cancer, was 109,000 at its peak meaning that Chris Cornett's cancer was approximately 10 times more aggressive than Lance Armstrong's.

132. A normal human male should have a Beta HCG level between 0-2.

133. Chris Cornett was given approximately a 5% chance to live upon or shortly after diagnosis.

134. Multiple surgeries were performed on Chris Cornett, including removal of his right testicle, removal of numerous lymph nodes, and right and left thoracotomies.

135. During the summer of 2016, Chris Cornett received more than 520 hours of chemotherapy in approximately twenty-two days to address his tumors.

136. Throughout chemotherapy, Chris Cornett was treated with VIP (Etoposide, Ifosfamide, Cisplatin), which caused significant side effects.

137. Permanent scars are visible on the front and back of Chris Cornett's body as a result of the surgery.

138. As a result of his diagnosis and treatment, Chris Cornett cannot reproduce.

139.    Chris Cornett is thirty-four (34) years old.

140.    Chris Cornett does not have children.

141.    Chris Cornett always wanted to have biological children.

142.    Chris Cornett wants to have biological children.

143.    Chris Cornett suffers from mental stress and anxiety due to the fact that he cannot have a biological child.

144.    Chris Cornett suffers from an immense fear of recurrence of his testicular cancer and the development of other illnesses as a result of his exposure to the contaminants discussed herein.

145.    In or about August 2017, Bruce Cornett was diagnosed with prostate cancer.

146.    Bruce Cornett was treated by seed implant/radiation therapy in October 2017.

147.    Bruce Cornett suffers from an immense fear of recurrence of his prostate cancer and the development of other illnesses as a result of his exposure to the contaminants discussed herein.

148.    Chris Cornett, Bruce Cornett and Cathy Cornett each live in fear that one another will be diagnosed with cancer again or some other form of illness as a result of their respective exposures to the contamination discussed herein.

149.    Chris Cornett, Bruce Cornett and Cathy Cornett, were each active healthy adults prior to being diagnosed with cancer.

150.    In fact, as recent as 2012, Chris Cornett successfully completed an Olympic Triathlon on Long Island.

151.    None of Bruce or Cathy's siblings or parents were diagnosed with testicular, kidney, or prostate cancer at any point in their lives.

152.    Plaintiffs have expended and will be required to expend significant resources

18

indefinitely for many years into the future to safeguard their health, including health monitoring, testing and treatment.

## CAUSES OF ACTION

### First Cause of Action
(Negligence)

153.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 152 as though fully set forth at length herein.

154.     Defendant had a duty to Plaintiffs to manage, store, transport, dispose, and remediate hazardous substances and hazardous waste at and emanating from the Grumman site, the NWIRP site, and the Former Grumman Settling Ponds area with reasonable care.

155.     Defendant breached its duty to Plaintiffs by negligently managing, storing, transporting, disposing and failing to remediate the hazardous substances and hazardous waste at and emanating from the Grumman site, the NWIRP site, and the Former Grumman Settling Ponds area.

156.     Defendant's breaches are the actual and proximate cause of the personal injuries and pain and suffering sustained by Plaintiffs.

157.     Defendant's breaches are and have been willful, wanton, malicious, and or/reckless.

158.     As a result of the foregoing, Defendant is liable to the Plaintiffs for: actual, direct, indirect, incidental and consequential compensatory damages for the personal injuries and pain and suffering Plaintiffs sustained in an amount to be determined at the trial of this action, but in any event in an amount exceeding $100,000,000 for each of the Plaintiffs, costs for medical monitoring of Plaintiffs' medical conditions, punitive damages in  a sum to be determined at the trial of this action, pre- and post- judgment interest, costs, and attorneys' fees.

## Second Cause of Action
### (Strict Liability)

159.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 152 as though fully set forth at length herein.

160.    Defendant's management, storage, transport and disposal of the hazardous substances and hazardous waste at the Grumman site, the NWIRP site, and the Former Grumman Settling Ponds area constituted ultrahazardous activities.

161.    Defendant caused or allowed ultrahazardous or abnormally dangerous substances to be released, discharged or disposed of into the surrounding air, soil and groundwater.

162.    Defendant's improper management, storage, transport, disposal and remediation of the hazardous substances and hazardous waste at and emanating from the Grumman site, the NWIRP site, and the Former Grumman Settling Ponds area affected Plaintiffs by exposing them to unwanted contaminants.

163.    Defendant's activities at the Grumman site, the NWIRP site, and the Former Grumman Settling Ponds are the actual and proximate cause of the personal injuries and pain and suffering sustained by Plaintiffs.

164.    As a result of the foregoing, Defendant is strictly liable in tort to Plaintiffs for: actual, direct, indirect, incidental and consequential compensatory damages for the personal injuries and pain and suffering Plaintiffs sustained in an amount to be determined at the trial of this action, but in any event in an amount exceeding $100,000,000 for each of the Plaintiffs, costs for medical monitoring of Plaintiffs' medical conditions, punitive damages in  a sum to be determined at the trial of this action, pre- and post- judgment interest, costs, and attorneys' fees.

**WHEREFORE,** plaintiffs Christopher J. Cornett, Bruce Cornett and Cathy Cornett request judgment as against defendant Northrop Grumman Corporation granting the following relief:

i.      Awarding actual, direct, indirect, incidental and consequential compensatory damages for the personal injuries and pain and suffering Plaintiffs sustained in an amount to be determined at the trial of this action, but in any event in an amount exceeding $100,000,000 for each of the Plaintiffs;

ii.      Awarding costs associated with future medical monitoring of Plaintiffs' medical conditions;

iii.      Awarding punitive damages in a sum to be determined at trial; and

iv.      Awarding interest upon the judgment, with costs, disbursements, attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated:  November 13, 2018
          Melville, New York

**RIGANO LLC**
*Attorneys for Christopher J. Cornett, Bruce Cornett and Cathy Cornett*

By: *s/ Nicholas C. Rigano*
      James P. Rigano, Esq.
      Nicholas C. Rigano, Esq.
      Leslie R. Bennett, Esq.
      Alyse Delle Fave, Esq.
      538 Broad Hollow Road, Suite 217
      Melville, New York 11747
      (631) 756-5900

21