UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CHRISTOPHER J. CORNETT, BRUCE CORNETT,
and CATHY CORNETT

      **MEMORANDUM & ORDER**

    Plaintiff,    18-CV-06453 (DRH)(AKT)

 -against-

NORTHROP GRUMMAN CORPORATION,
and NORTHROP GRUMMAN SYSTEMS
CORPORATION,

    Defendants.
------------------------------------------------------------------X

**APPEARANCES:**

**For Plaintiffs:**

Rigano LLC
538 Broad Hollow Road, Suite 217
Melville, New York 11747
By: James P. Rigano, Esq.
   Nicholas C. Rigano, Esq.
   Leslie R. Bennett, Esq.
   Alyse Delle Fave, Esq.

**For Defendants:**

Morrisson & Foerster LLP
250 West 55th Street
New York, New York 10019
By: Grant J. Esposito, Esq.
   Jessica Kaufman, Esq.
   Katie L. Viggiani, Esq.
   Robert J. Baehr, Esq.

Hollingsworth LLP
1350 I Street, N.W.
Washington, D.C. 20005
By: Frank Leone, Esq.

**HURLEY, Senior District Judge:**

Christopher J. Cornett ("Chris"), Bruce Cornett ("Bruce"), and Cathy Cornett ("Cathy") (collectively, "Plaintiffs" or "Cornetts") brought this action for negligence and strict liability against Northrop Grumman Corporation and Northrop Grumman Systems Corporation (collectively, the "Defendants") for injuries and damages allegedly suffered as a result of the release of hazardous substances from Northrop Grumman's former site of approximately 605 acres in Bethpage, New York. Presently before the Court is Defendants' motion to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, the motion is denied.

## BACKGROUND

The following allegations are taken from the Amended Complaint ("Am. Comp.") and assumed true for purposes of this motion, unless otherwise noted.

### Parties

Plaintiffs Chris Cornett, Bruce Cornett, and Cathy Cornett are a family from Bethpage, New York. Bruce and Cathy Cornett, husband and wife, have lived in Bethpage since February 10, 1984. (Am. Compl. [ECF No. 7] ¶¶ 6-9.) Chris Cornett, son of Bruce and Cathy Cornett, lived in Bethpage, New York from his birth in 1984 until April 2018. (Am. Compl. ¶¶ 4-5.)

Defendant Northrup Grumman, a successor to Northrop Corporation, and Defendant Northrop Grumman Systems, a wholly owned subsidiary of Defendant Northrop Grumman, are corporations organized under the laws of the State of Delaware with their principal places of business and headquarters in Virginia. (Am. Compl. ¶¶ 11-13.)

### Defendants' Activities in Bethpage

Beginning in the early 1930s and for decades thereafter, Grumman Aerospace Corporation, a predecessor of Defendant Northrop Grumman, operated a facility in Bethpage, New York. (Am. Compl. ¶ 14.) The facility, which encompassed approximately 605 acres ("Grumman site") was owned and operated by Defendants. (Am. Compl. ¶¶ 14-15.) "The operations at the Grumman site comprised the engineering, manufacturing, primary assembly, and research/development testing of a variety of military and aerospace crafts." (Am. Compl. ¶ 16.)

Within approximately 108 acres of the Grumman site, the United States Navy established a facility known as the Naval Weapons Industrial Reserve Plant ("NWIRP site") for "design engineering, research prototyping, testing, fabrication and primary and subassembly of various naval aircrafts." (Am. Compl. ¶¶ 17, 19.) The NWIRP site was owned by the Navy but operated by Defendants and their predecessor entities. (Am. Compl. ¶ 18.) Plaintiffs allege upon information and belief that, "since no later than 1947, Defendants were aware or should have been aware that their operations at the Grumman site and the NWIRP site were causing subsurface hazardous waste contamination in Bethpage." (Am. Compl. ¶¶ 20-21).

Defendant Northrop Grumman Systems and/or its predecessor entities owned and/or operated approximately eighteen acres of land adjacent to the Grumman site ("18-acre property"). (Am. Compl. ¶ 22.) Defendants, through their predecessor entities, used a portion of the 18-acre property, known as the Former Grumman Settling Ponds Area, "as a dumping ground for hazardous waste, specifically for dewatering of sludge, including neutralized chromic acid waste from the wastewater treatment facility located at the Grumman site," from approximately 1949 to 1962. (Am. Compl. ¶ 23.) In 1962, Defendant Northrop Grumman Systems and/or its

predecessor entity, Grumman Aircraft Engineering Corporation, donated the 18-acre property to the Town of Oyster Bay ("Oyster Bay"). (Am. Compl. ¶ 26.) Prior to donating the 18-acre property, which included the Former Grumman Settling Ponds area, Defendants and their predecessors knew or should have known that the property was "grossly contaminated" and that "the Town of Oyster Bay intended to use the property for a public park where children, among others, would play." (Am. Compl. ¶ 29.) "Defendants and their predecessors" did not inform Oyster Bay "until decades after donating the property" that they used the 18-acre property for waste disposal and that it was grossly contaminated. (Am. Compl. ¶¶ 30-31.)

**Subsequent Use and Contamination of the Grumman Site and 18-acre property**

Since 1962, Oyster Bay has used the 18-acre property as the Bethpage Community Park for public recreation purposes. For example, in or shortly after 1962, Oyster Bay built a baseball field on the Former Grumman Settling Ponds area, where children played little league baseball for decades. (Am. Compl. ¶¶ 33-34.)

In 1983, the Grumman site was added to the New York State Registry of Inactive Hazardous Waste Sites ("Superfund sites") maintained by the New York State Department of Environmental Conservation ("DEC"). (Am. Compl. ¶ 35.) In 1987, the Grumman site was classified as a class 2 Superfund site, which means that it "poses a significant threat to human health and/or the environment and for which action is required." (Am. Compl. ¶¶ 35-36.)[1]

Plaintiffs allege that "[m]ultiple contaminants from the Grumman site, the NWIRP site, and the Forman Grumman Settling Ponds area have entered the groundwater and migrated with the groundwater south and southeast within Bethpage, extending horizontally to form an

---

[1] The Grumman site and NWIRP site were later separated and listed as independent class 2 Superfund sites. (Am. Compl. ¶ 37.)

approximately six (6) square mile area of contamination and to a depth of approximately 750 feet ('Plume')," impacting drinking water supply wells in Bethpage. (Am. Compl. ¶¶ 55-56.)

**Contaminants Allegedly Discharged by Defendants**

Drinking Water

"Numerous [volatile organic compounds ("VOCs")] contaminants have been found in the groundwater emanating from the Grumman site, the NWIRP site and the Former Grumman Settling Ponds area at levels within the Plume up to 15,000 ppb, nearly 3,000 times acceptable groundwater levels." (Am. Compl. ¶ 60.) The VOCs of concern within the Plume have been found to cause kidney, testicular, prostate and other types of cancer. (Am. Compl. ¶¶ 61-62.) The VOCs have impacted public drinking water supply wells located within the Plume, including water supplied to Plaintiffs' home, since at least 1984 but were not treated to reduce VOC contamination until 1988. (Am. Compl. ¶¶ 63-65.)

Beginning in 2012, "radium-226 and radium-228 (together, "Radium"), radioactive metals that are known human carcinogens, were both tested for the first time in public drinking water supply wells located within the Plume." (Am. Compl. ¶ 71.) Radium was detected in at least one public water supply well located within the Plume at levels exceeding five (5) pCi/L, which is the maximum contaminant level ("MCL") established by the United States Environmental Protection Agency ("EPA") and DEC. As a result, the well was shut down in 2013. (Am. Compl. ¶¶ 72-73.) In 2016, for the first time, Defendants' consultant revealed that Defendants used many radioactive materials, including Radium, during their operations at the Grumman site and/or the NWIRP site. (Am. Compl. ¶¶ 74-75.)

Defendants also used 1,4 dioxane at the Grumman site, another chemical that has been detected throughout the Plume and in public water supply wells in Bethpage. (Am. Compl. ¶¶

85-86.) 1,4-dioxane is an "emerging" man-made chemical that is a "probable human carcinogen." (Am. Compl. ¶¶ 78-80.) In 2013, the Bethpage local water district tested 1,4-dioxane for the first time and detected levels in the effluent of its public drinking water supply wells up to 8.6 ppb, more than 24 times the 0.35 ppb EPA health advisory level. (Am. Compl. ¶¶ 88-89.)

"Upon information and belief, as a result of Defendants' operations, other unidentified contaminants, including, but not limited to perfluoroalkyl and polyfluoroalkyl substances ("PFAS"), are, were, or have been contained in the Plume and the drinking water supplied to Plaintiffs at toxic levels." (Am. Compl. ¶ 99.) PFAs are "likely human carcinogens that cause an increased risk" of testicular, kidney, prostate, and other types of cancer. (Am. Compl. ¶ 101.)

Soil

"[Polychlorinated biphenyls ("PCBS")], VOCs, [semivolatile organic compounds ("SVOCs")] and metals have been detected in the soil at the Former Grumman Settling Ponds area and where the baseball field has been at levels up to 3,400,000 ppb, or 3,400 times DEC soil cleanup objectives for recreational activity." (Am. Compl. ¶ 68.) These metals, which have been present in the soil at the Bethpage baseball field for decades, have been linked to an increased risk of testicular, kidney, prostate, and other types of cancer. (Am. Compl. ¶ 70.)

**Official Records Regarding the Contamination**

In 1995, both the DEC and the Navy issued Records of Decision ("ROD") with respect to the contamination of the soil and groundwater by various hazardous wastes, including certain VOCs at the Grumman and NWIRP sites respectfully. (Am. Compl. ¶¶ 38-39.) The DEC issued another ROD in March 2001 "with respect to offsite groundwater contamination emanating from the Grumman site and the NWIRP site." (Am. Compl. ¶ 40.) At that time, the contaminated

groundwater plume was determined to extend over an area of approximately 2,000 acres and to a depth of 7,000 feet. (Am. Compl. ¶ 41.) The DEC determined that various contaminants identified in the groundwater emanating from the Grumman and NWIRP sites, including VOCs, SVOCs, pesticides, and PCBs exceeded Standards, Criteria and Guidance values ("SCGs") for drinking water. (Am. Compl. ¶ 42.) It further determined that the primary VOC contaminants used or disposed of at the Grumman and NWIRP sites were trichloroethylene ("TCE"), perchloroethylene[2] ("PCE"), dichlorothenes ("DCEs"), vinyl chloride, and 1,1,1 trichloroethane. (Am. Compl. ¶ 43.) The DEC called for remediation of those contaminants, specifically "(i) 'hot spot' treatment to remediate offsite VOC groundwater contaminants in specified area(s) of the Plume [], (ii) long term groundwater monitoring; and (iii) wellhead treatment for public drinking water supply wells impacted by the Plume," but does not require that all contaminants within the Plume be remediated to levels deemed non-hazardous to human health or the environment by New York State law. (Am. Compl. ¶¶ 44-47.) The public drinking water wells within the Plume did, and continue to, supply drinking water to the Cornett's homes in Bethpage, New York. (Am. Compl. ¶ 48.)

In March 2013, DEC issued a ROD with respect to the 18-acre property, determining that various contaminants found in the Former Grumman Settling Ponds "significantly exceeded the soil cleanup objectives and SGCs for drinking water, including VOCs, SVOCs, PCBs and metals," and that residential homes south of the Former Grumman Settling Ponds area were also impacted by PCBs and chromium. (Am. Compl. ¶¶ 50-52.) The DOC required the removal of the contamination by excavation and disposal of approximately 25,000 cubic yards of soil containing PCBs in excess of 50 parts per million ("ppm") from approximately 3 acres within the area,

---

[2] Perchloroethylene is also known as "perc" or tetrachloroethylene. (Am. Compl. ¶ 43.)

including where the baseball field was located, however, a "vast majority" of the contaminated soil has not yet been excavated. (Am. Compl. ¶¶ 53-54.)

**Plaintiffs' Exposure to Contaminants**

The two homes that Plaintiffs lived in during the relevant time period are less than a half of a mile southeast of the Grumman site.[3] (Am. Compl. ¶¶ 103-04.) While at home, the Cornetts exclusively used water from the bathroom and kitchen taps, which are supplied with water from the wells located within the Plume. (Am. Compl. ¶¶ 105-106.) The public schools that Chris Cornett attended in Bethpage were also supplied with drinking water from public water supply wells located within the Plume. (Am. Compl. ¶¶ 111-12.) From 1988 through 1998, Chris "regularly played" Little League baseball at the baseball field located at Bethpage Community Park, which was the Former Grumman Settling Ponds area, during both the fall and spring seasons. (Am. Compl. ¶ 113.) "Cathy and Bruce Cornett would regularly watch Chris play baseball games at Bethpage Community Park." (Am. Compl. ¶ 115.) From 1991 through 1998, Chris attended summer camp at Bethpage Community Park, where he would spend at least one-third of his time on the baseball field. (Am. Compl. ¶¶ 116-17.) Additionally, "[w]ater fountains and grass sprinkler systems in Bethpage Community Park were supplied with drinking water from public water supply wells located within the Plume." (Am. Compl. ¶¶ 118-19.)

Plaintiffs' Cancer Diagnoses

All three members of the Cornett family were diagnosed with cancer between 2015 and 2017. In December 2015, Cathy Cornett was diagnosed with cancer in her left kidney and had surgery to remove the kidney. (Am. Compl. ¶¶ 126-27.) In or about June 2016, Chris Cornett

---

[3] The Cornetts have lived in Bethpage, New York since 1984, first at 130 South 2nd Street and then at 19 Caroline Street. Cathy and Bruce continue to live in Bethpage, while Chris moved to Blauvelt, New York, away from the affected area, in April 2018. (Am. Compl. ¶¶ 4-9.)

was diagnosed with testicular cancer, which metastasized to other parts of his body, including his retroperitoneal, pelvic, and mediastinal lymph nodes; liver; lungs; and brain. (Am. Compl. ¶¶ 130-31.) Chris Cornett received chemotherapy and had multiple surgeries, including removal of his right testicle, numerous lymph nodes, and right and left thoracotomies. (Am. Compl. ¶¶ 136-138.) He can no longer reproduce. (Am. Compl. ¶ 140.) In or about August 2017, Bruce Cornett was diagnosed with prostate cancer, and was "treated by seed implant/radiation therapy" a few months later. (Am. Compl. ¶¶ 151-152.) "Chris Cornett, Bruce Cornett and Cathy Cornett, were each active healthy adults prior to being diagnosed with cancer." (Am. Compl. ¶ 154.)

## DISCUSSION

### I. *Rule 12(b)(6) Legal Standard*

In deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a cause of action, a court should "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted). The plausibility standard is guided by two principles. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)); *accord Harris v. Mills*, 572 F.3d 66, 71–72 (2d Cir. 2009).

First, the principle that a court must accept all allegations as true is inapplicable to legal conclusions. Thus, "threadbare recitals of the elements of a cause of action supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679. A plaintiff must provide facts sufficient to allow each named defendant to have a fair

understanding of what the plaintiff is complaining about and to know whether there is a legal basis for recovery.  *See Twombly*, 550 U.S. at 555.

Second, only complaints that state a "plausible claim for relief" can survive a motion to dismiss. *Iqbal*, 556 U.S. at 679. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but asks for more than a sheer possibility that defendant acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line' between possibility and plausibility of 'entitlement to relief.'" *Id*. at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal citations omitted); *see In re Elevator Antitrust Litig*., 502 F.3d 47, 50 (2d Cir. 2007).  Determining whether a complaint plausibly states a claim for relief is "a context specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679; *accord Harris*, 572 F.3d at 72.

> II. *Allegations Made Upon Information and Belief*

Preliminarily, Defendants take issue with Plaintiffs' allegations made "upon information and belief." Defendants argue that Plaintiffs allegations based on information and belief "must be formed after an inquiry reasonable under the circumstances." (Defs.' Mem. in Supp. [ECF No. 23] at 12 (citing *Sanders v. Grenadier Realty, Inc.*, 367 F. App'x 173, 175 n.2 (2d Cir. 2010) (internal quotation marks omitted).) Defendants further argue that "[a]llegations upon information and belief may be taken as true only when '[1] the facts are peculiarly within the possession and control of the defendant, or [2] where the belief is based on factual information that makes the inference of culpability plausible." (Defs.' Mem. in Supp. at 13 n.7 (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 118 (2d Cir. 2010)).) Upon a review of the allegations in

the Complaint made on information and belief, the Court concludes that these allegations are either facts that would likely be within the possession and control of Defendants or are based on factual information that makes the inference of culpability plausible. The Court will therefore consider them in the instant motion.

### III. Consideration of Materials Outside the Complaint

As another preliminary matter, the Court must determine what materials "outside" the Complaint it may properly consider on this motion. Plaintiffs specifically object to five documents that Defendants rely upon: (1) the 2017 Water Infrastructure Improvements for the Nation ("WIIN") Act Report; (2) the April 2018 WIIN Act Report Addendum; (3) the June 2018 WIIN Act Report Addendum; (4) the Bethpage Water District Blog article titled "About the Northrop Grumman/Navy Site"; and (5) the 2013 New York State Department of Health ("NYSDOH") Study (collectively, the "Contested Documents"). Northrop Grumman contends that the Court may consider "public disclosure documents required by law to be, and that have been, filed with [government agencies]." (Defs.' Mem. in Supp. at 12.) Plaintiffs argue that the case Defendants' cite in support of their argument, *Lopez v. Nassau Cty. Sheriffs Dep't*, only applies to documents filed with the Securities and Exchange Commission ("SEC"). 2018 WL 3321430 at *3 (E.D.N.Y. 2018). (Pls.' Mem. in Opp. [ECF No. 28] at 4-5.) Plaintiffs further argue that "courts may not simply take judicial notice of any and all 'public record documents' unless those documents meet the specific requirements of FRE 201(b)." (Pls.' Mem. in Opp. at 5 (citing *Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991)).)

As this Court laid out in *Lopez*, in adjudicating a Rule 12(b)(6) motion, a court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the complaint and relied upon in it,

> even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*Lopez*, 2018 WL 3321430 at *3 (citing *In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356–57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part & rev'd in part on other grounds sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005)).

Plaintiff is correct that the language in *Lopez* and the case it relies on, *In re Merrill Lynch & Co.*, specifically discuss documents filed with the Securities and Exchange Commission. *In re Merrill Lynch* was a securities fraud case, and the cases that it relied on for the proposition that it could consider "public disclosure documents required by law to be, and that have been, filed with the [SEC]", also specifically dealt with securities fraud. Furthermore, the court in *Kramer*, a case relied on by both Plaintiffs and Defendants, explained that it considered certain SEC disclosure documents because they were required by law to filed with the SEC and because the documents were "the very documents that are alleged to contain the various misrepresentations or omissions that are relevant *not to prove the truth of their contents but only to determine what the documents stated.*" *Kramer*, 937 F.2d at 774 (emphasis added).

Nonetheless, and as noted by the *Kramer* court, Defendants are correct that courts may take judicial notice of publicly available documents on a motion to dismiss. *See Lopez*, 2018 WL 3321430 at *3; *Porrazzo v. Bumble Bee Foods, LLC*, 822 F. Supp. 2d 406, 411 (S.D.N.Y. 2011) (citing *Byrd v. City of N.Y.*, No. 04–CV–1396, 2005 WL 1349876, at *1 (2d Cir. June 8, 2005)). A "court may judicially notice a fact that is not subject to reasonable dispute because it…can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). On a motion to dismiss, a court should take judicial notice

of documents to determine statements contained therein, not for the truth of the matters asserted. *Kramer*, 937 F. d at 774; *Porrazo*, 822 F. Supp. 2d at 412.

Even if the facts that Defendants want this Court to judicially notice were not subject to dispute, Defendants are requesting that this Court judicially notice those facts for the purpose of refuting Plaintiffs' allegations.[4] Doing so requires considering the Contested Documents for the truth of the matters asserted therein, however that is not something the Court can properly do on a motion to dismiss. *Kramer*, 937 F. 2d at 774; *Porrazo*, 822 F. Supp. 2d at 412. Thus, the Court declines to consider the Contested Documents for purposes of this motion.

IV. *Factual Disputes*

Defendants argue that the complaint should be dismissed because "[t]he public record shows that Plaintiffs were not exposed to TCE or other VOCs, radium, or other 'unidentified' contaminants as alleged," and because Plaintiffs have not alleged that they came into contact with soil containing hazardous levels of contaminants. (Defs.' Mem. in Supp. at 13, 21.) Defendants assert that Plaintiffs' allegations are "contradicted by the extensive public record," *id.*, however those assertions are undermined by the very documents Defendants attached to their motion, which show on-going remediation efforts to address the contamination Plaintiffs allege they were exposed to. *See, e.g.* Kauffman Decl., Ex. 4 [ECF No. 24-3] (2013 ROD) at 2 ("The soil from the surface to 10 feet [below ground surface], will be excavated [] to achieve the Commissioner Policy (CP 51) oil cleanup approach for PCBS….[a]ll other contaminated fill and soil which exceeds the restricted residential use soil cleanup objectives for other contaminants to

---

[4] Defendants argue that this Court cannot "accept as true pleading allegations that are contradicted by facts that can be judicially noticed." (Defs.' Reply Mem. in Supp. [ECF No. 29] at 3-4). Defendants cite to Wright & Miller Fed. Prac. & Proc. Civ. § 1363, however a close reading of Wright & Miller indicates that the quoted language comes from *Anderson v. Fishback*, 2009 WL 2423327, *2 (E.D. Cal. 2009) in the "Matters considered" section, rather than the actual Wright & Miller commentary. Either way, the proposition is not binding on this Court, and Defendants offer no other persuasive authority for their proposition.

a depth of 10 feet, in the PCB removal area, will be excavated and disposed off-site in a permitted facility."); 3 ("The approximately one acre VOC rag pit…in the Former Grumman Settling Pond Area, will be remediated…").[5]

In any event, the instant motion is one for dismissal, not summary judgment, and Defendants' detailed factual objections are better saved for a later stage of this case. At the motion to dismiss stage, Plaintiffs need only make out a *plausible* claim for relief. Rather than address this standard, Defendants devote much of their papers to detailed factual disputes, cherry picking language that is often out of context. Given the legal standard applicable at this preliminary stage, the Court declines the invitation to engage in an extensive fact-finding mission at this juncture and denies Defendants' motion to dismiss based on perceived factual inaccuracy.[6]

V. *Strict Liability Claim*

Defendants argue that Plaintiffs' strict liability claim fails because Defendants are entitled to derivative sovereign immunity given their work with the Navy, and even if not, their use and storage of chemicals does not qualify as "abnormally dangerous activity."

With respect to derivative sovereign immunity, Defendants argue that Plaintiff's claims arise from Defendants' activities as a Navy contractor. While the federal government may be immune from strict liability claims based on ultrahazardous activity, *see Laird v. Nelms*, 406 U.S. 797 (1972) it is unclear whether that immunity extends to Defendants. Defendants cite to

---

[5] The Court parenthetically notes the extensive public record indicating that the Grumman site and 18-acre area are still subject to remediation efforts. For example, in April 2016, the 18-acre area, which now serves as the Bethpage Community Park, was closed "in connection with a New York State investigation into claims that large drums were found at the site in the 1990s and subsequently covered up." *See Romano v. Northrop Grumman Corp.*, 2019 WL 2476226 (E.D.N.Y. June 13, 2019) (internal quotations and citations omitted).

[6] Though the Court declines to grant Defendants' motion at this stage, the Court shares Defendants' concerns about Plaintiffs' allegations regarding "unidentified contaminants". To the extent Plaintiffs' claims survive the instant motion to dismiss, they do so based on the allegations pertaining to particular, identified contaminants.

only one case for the proposition that this immunity enjoyed by the federal government extends to government contractors, a case out of the Western District of Kentucky. *See Lamb v. Martin Marietta Energy Sys., Inc.*, 835 F. Supp. 959, 960-61 (W.D. Ky. 1993). That case explicitly rejected the defendants' argument that they were entitled to derivative sovereign immunity but did hold that "it would thwart the government's retained immunity against strict liability if the plaintiffs were allowed to pursue [strict liability for ultrahazardous activities] against the contractors." *Id*. at 963, 971. Besides the fact that this Court is not bound by a decision from the Western District of Kentucky, the Court concludes that it is unable to address Defendants' arguments regarding immunity given that they depend on facts which have not yet been developed due to the preliminary posture of the case. There are a number of questions which would need to be answered before the Court can determine this issue, such as whether the entirety of Defendants' operations at the Grumman site (of which the NWIRP only took up roughly 1/6 of the area) were done on behalf of the Navy. For similar reasons, the Court is unable to determine whether Defendants were aiding the Navy in carrying out "public duty" activities.[7]

Defendants argue that even if they are not derivatively immune and their actions do not fall within a public duty exception, Plaintiffs have not alleged that Defendants' actions were "ultrahazardous" or "abnormally dangerous." (Defs.' Mem. in Supp. at 23). Under New York law, courts examine six factors from the Restatement (Second) of Torts § 520 to determine whether a particular activity is abnormally dangerous: "a) existence of a high degree of risk of some harm to the person, land or chattels of others; (b) likelihood that the harm that results from it will be great; (c) inability to eliminate the risk by the exercise of reasonable care; (d) extent to

---

[7] That these facts have not been established has no bearing on the plausibility of Plaintiffs claims, as the answers to these questions are not necessary to establish Plaintiffs' claims.

which the activity is not a matter of common usage; (e) inappropriateness of the activity to the place where it is carried on; and (f) extent to which its value to the community is outweighed by its dangerous attributes." *Doundoulakis v. Town of Hempstead*, 42 N.Y.2d 440, 448 (1977) (internal quotations omitted). "Analysis of no one factor is determinative." *Id.*

Based on the allegations in Plaintiffs' complaint, it appears as though at least the second factor is satisfied. Plaintiffs have alleged that the contaminants discharged by Defendants have been linked to cancers. *See* Am. Compl. ¶¶ 61-62, 70, 101; *Abbatiello v. Monsanto Co.*, 522 F. Supp. 2d 524, 533 (S.D.N.Y. 2007) ("Accepting the allegations in the Employees' complaint as true compels the Court to conclude that PCBs are highly toxic substances, with the potential to cause 'cancer, liver disease, suppression of the immune system, imbalance of hormonal systems, reduction in IQ, thyroid dysfunction, heart dysfunction, hypertension, diabetes, nervous system disorders, sex hormone imbalances, adverse skin conditions and other maladies in humans.'"); *Town of New Windsor v. Avery Dennison Corp.*, 2012 WL 677971, at *12 (S.D.N.Y. Mar. 1, 2012) ("Plaintiff has alleged that Defendants have, for decades, been using large amounts of hazardous solvents, some of which can cause liver, nervous system, and circulatory problems, as well as an increased risk of cancer.")

Nonetheless, the Court requires additional fact-finding before definitively determining this issue and therefore denies Defendants' motion to dismiss the Amended Complaint on this issue. *See Abbatiello*, 522 F. Supp. 2d at 533 (denying motion to dismiss where court did not have sufficient evidence as to Restatement factors); *see also Outlet City, Inc. v. W. Chem. Prod., Inc.*, 60 F. App'x 922, 928 (3d Cir. 2003) ("[W]hether a certain kind of manufacturing activity was abnormally dangerous in the place where it occurred is a highly fact-sensitive question that

cannot be determined as a matter of law by comparison to other highly fact-sensitive cases.").

Accordingly, Defendants' motion to dismiss the strict liability claim is denied.

## CONCLUSION

Defendants' motion to dismiss the claims asserted in the Amended Complaint is denied.

**SO ORDERED.**

Dated: Central Islip, New York       s/ Denis R. Hurley
     January 6, 2020                        Denis R. Hurley
                                             United States District Judge